JUDGE SWAIN

UNITED STATES DISTRIC COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

14 CV 6235

ARTURO MORA,

Index No.:

Plaintiff,

**COMPLAINT**

-against-

**JURY TRIAL
DEMANDED**

THE CITY OF NEW YORK, SERGEANT MIGUEL
SANCHEZ (NYPD) SHIELD #2409, OFFICER
JEFFREY HEILIG (NYPD) SHIELD #1065, OFFICER
BRIAN HOLSHEK (NYPD) SHIELD # 5550, OFFICER
GIBSON (NYPD), AND OFFICERS JOHN DOE #1-10
(THE NAME JOHN DOE BEING FICTICIOUS, AS THE
TRUE NAME(S) IS/ARE PRESENTLY UNKNOWN),



Defendants.
------------------------------------------------------------------X

The Plaintiff, complaining by his attorney(s), THE LAW OFFICE OF ANDREW L.

HOFFMAN, P.C., respectfully shows to this Court and alleges:

**INTRODUCTION**

1.  This is a civil rights action to vindicate the rights of Plaintiff Arturo Mora, a young man

falsely charged with felony robbery after police knowingly forwarded false, unreliable

and otherwise misleading evidence to the Bronx County District Attorney's office in

order to secure his conviction.

2.  Mr. Mora was acquitted of all charges after a jury trial, though not before he was forced

to endure two years of a malicious prosecution, which included spending a month in jail.

3.  The individual Defendants in this case are now being sued for their respective roles in the

Plaintiff's unjust prosecution.

4.  The City of New York is being sued for failing to properly train, supervise, and/or

discipline New York City police officers, and for continuing to tolerate and defend a

1

widely publicized departmental culture of willful indifference toward the rights of citizens.

## JURISDICTION

5.  Jurisdiction is founded upon the existence of a Federal Question.

6.  This is an action to redress the deprivation under color of statute, ordinance, regulation, custom, or usage of rights, privileges, and immunities secured to the Plaintiffs by the Fourth and Fourteenth Amendments to the Constitution of the United States pursuant to 42 U.S.C. Section 1983 and arising under the law and statutes of the State of New York.

7.  Jurisdiction is founded upon 28 U.S.C. Sections 1331, 1343(3) and 1343(4), this being an action authorized by law to redress the deprivation under the color of law, statute, ordinance, regulation, custom and usage of rights, privileges and immunities secured to Plaintiffs by the Fourth and Fourteenth Amendments to the Constitution of the United States.

## VENUE

8.  Venue lies in this District pursuant to 28 U.S.C.A. Section 1391(b) (2) since the events giving rise to the claim occurred in the Southern District.

## PARTIES

9.  At all times relevant, Plaintiff Arturo Mora was a resident of Bronx County, New York.

10.  Upon information and belief, at all times hereinafter mentioned, Defendants SERGEANT MIGUEL SANCHEZ and OFFICERS JEFFREY HEILIG, BRIAN

HOLSHEK, and GIBSON, were employed by the New York City Police Department, working out of the 44th Precinct, Bronx New York.

11. This action arises under the United States Constitution, particularly under provisions of the Fourth and Fourteenth Amendments of the Constitution of the United States, and under federal law, particularly the Civil Rights Act, Title 42 of the United States Code, Section 1983, and the rights guaranteed by the Constitution and laws of the State of New York.

12. Individual Defendants in this action are being sued in both their individual and official capacities.

## STATEMENT OF FACTS
### -Arturo Mora's Arrest-

13. The events giving rise to this action began Sunday, August 7, 2011 at approximately 12:30 AM on the corner of Morris Avenue and East 174th Street, Bronx, New York.

14. Plaintiff Arturo Mora and his buddy Freisis Santana were just returning from a night out in the city when they encountered a man named Flavio Agudo-Robles, whom they were both familiar with from the neighborhood.

15. Rather abruptly, Agudo-Robles approached the Plaintiff and his friend in a hostile manner, accusing Mr. Mora of carrying on a romantic relationship with his girlfriend.

16. Mr. Mora denied any such relationship, and he and Freisis Santana continued on their way to the nearby apartment of a friend, located at 1686 Morris Avenue, literally a stone's throw from where they encountered Agudo-Robles.

17. Shortly thereafter, Mora and Santana went to sleep in their friend's living room, along with several other friends who had gathered there.

3

18. Later that morning, the group was awakened by a terrifying banging at the door.

19. The banging was so forceful that it punched a hole through the wood near the lock.

20. After the police finally identified themselves as the ones banging, the owner of the apartment opened the door.

21. Defendants Sanchez, Heilig, Holshek, and Gibson then entered the apartment, guns drawn, without permission or authority, and placed the young men in the living room under arrest.

22. Police then took the owner of the house into the kitchen and demanded that she sign a consent form allowing them to search her home; terrified of what might happen if she refused, the owner complied.

23. Police then began searching the entire apartment.

24. Underneath a mattress in one of the bedrooms, police allegedly found a pistol and a small bag of ammunition.

25. The Defendant police then marched the young men outside of the apartment to be identified by an unknown complainant.

26. Once outside, Plaintiff Arturo Mora was informed that he had been identified, along with his friend Freisis Santana, in connection with a crime.

27. Shortly thereafter, police informed the two that Flavio Agudo-Robles had had accused them of hitting him in the face with a gun and attempting to rob him.

4

### Agudo-Robles and the Police: A Tale of Two Merging Agendas

28. Flavio Agudo-Robles believed Arturo Mora (or "Hito" as he called him) was romantically involved with his girlfriend, and he wanted revenge.

29. The residence where Mora and Santana entered after their exchange with Agudo-Robles—1686 Morris Avenue—had long been an address of interest to police, though they had never developed an articulable basis to investigate it.

30. It is at the intersection of these two agendas that Arturo Mora's rights were violated.

31. Agudo-Robles, in a fit of jealousy, impulsively hatched a scheme to have Arturo Mora arrested—and the Defendant police were all too happy to comply.

32. Agudo-Robles contacted a nearby beat officer and told him that Mora and Santana had just assaulted and attempted to rob him—then escaped several feet away to 1686 Morris Avenue.

33. Hearing this story, a light went off for the officer: finally, police had been provided with some rationale to investigate the house at 1686 Morris Avenue.

34. Unfortunately for the police, however, the story Agudo-Robles told made no sense—and no objectively reasonable officer would have believed it.

35. According to Agudo-Robles, out of nowhere, Mora approached him and stated, "I don't like you," and hit Agudo-Robles in the face—Santana then reached his hand in his pocket and tried to rob him.

36. Mora and Santana, both of whom Agudo-Robles admitted he knew from the neighborhood, then allegedly made their "escape," traveling just feet away to the house located at 1686 Morris Avenue, apparently making no effort to conceal where they were going.

37. Notably, Agudo-Robles had no injuries consistent with having been hit, and there were no witnesses to any assault, despite the fact that the alleged incident occurred on a weekend, in a well-populated area, on a beautiful summer night, where the neighborhood residents largely knew one another.

38. Nevertheless, despite the nonsensical nature of Agudo-Robles's story, the beat officer used his cell phone to contact his 44th precinct colleagues, Defendants Sanchez, Heilig, Holshek, and Gibson, who were working in plain clothes, and riding around in the same unmarked car.

39. Contacting the Defendant officers via cell phone enabled the officers to speak absent any outside scrutiny that would have accompanied a regular radio transmission.

40. The four named Defendants came to the scene immediately, eager to finally commence a long-desired search of the residence at 1686 Morris Avenue.

41. According to the officers, they banged on the door of the second floor apartment where Mora and others were sleeping for several minutes before being allowed inside, via consent of the owner.

42. Once inside, according to police, the owner of the residence expanded that consent to include a search of the premises; it was then that officers allegedly recovered a gun from a mattress in one of the bedrooms.

43. Notably, gun arrests are one of the most prestigious "collars" New York City police officers can make, so the discovery represented a significant event for the ambitious officers.

44. Unfortunately, the officers couldn't tie the gun to any of the young men in the apartment who had been asleep in the living room and didn't live there—that is, unless Agudo-Robles would alter his story, ever so slightly, to include use of the gun.

45. Accordingly, police suggested or otherwise persuaded Agudo-Robles to take his story a step further and say Arturo Mora had not only hit him, but had hit him with the butt of the gun they discovered in the apartment.

46. Agudo-Robles complied.

47. Notably, at no point did police seek or provide medical attention for Agudo-Robles, nor did Agudo-Robles seek any for himself, despite allegations that he had been slammed in the face with the butt of a gun.

48. Police also neglected, at any point, to take pictures of any alleged injuries to Agudo-Robles.

49. Upon information and belief, when Agudo-Robles testified before the Grand Jury several days later, he had no visible injuries to his face.

50. It is likewise notable that over the course of the two year prosecution of Arturo Mora, the gun was never tested for fingerprints or DNA.

51. Nevertheless, Arturo Mora was arrested pursuant to the actions of the Defendant officers, absent probable cause, and incarcerated for approximately a month before he was able to make bail.

52. The malicious prosecution of Arturo Mora continued for some two years before Mora was ultimately acquitted of all charges.

53. Upon information and belief, terrified that his unjust prosecution would result in years of unjust incarceration, Freisis Santana resolved his case by pleading to a lesser charge.

54. Arturo Mora was acquitted based largely on the utterly unbelievable and inconsistent testimony of Agudo-Robles.

55. In speaking with a private investigator shortly before Arturo Mora was acquitted, Agudo-Robles complained that "police and the district attorney" had been calling him and his father "five times a day," and that he simply wanted to "end this case."

56. "It isn't important to me if they [Santana and Mora] go to jail," Agudo-Mora told the investigator, "All I want is for the calls and all the rest of it to stop."

57. Upon information and belief, in the days following Arturo Mora's wrongful arrest and prosecution, Defendants Heilig and Holshek were both promoted to the rank of sergeant.

## AS AND FOR THE FIRST CAUSE OF ACTION
## ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS

### Violation of Constitutional Rights Under Color of State Law

### —False Arrest and Imprisonment—

58. Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 57.

59. The Fourth Amendment of the United States Constitution protects citizens from unreasonable searches and seizures by government officials, and prohibits law enforcement officers from arresting and detaining individuals in the absence of appropriate authorization.  The Fourth Amendment also precludes police officers from conducting arrests in the absence of probable cause to believe that a crime has been committed.

60. Defendants arrested Arturo Mora absent probable cause.

61. The actions of Defendants violated Arturo Mora's rights under the United States Constitution.  Given the total absence of any legal justification for arresting Arturo Mora,

and the total lack of credibility of the Complainant, it was not objectively reasonable to

arrest Arturo Mora for anything on August 7, 2011.

62. Defendants' actions were motivated by bad faith and malice.

63. This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983,

given that said actions were undertaken under color of state law.

64. As a direct and proximate result of the unconstitutional acts described above, Plaintiff

Arturo Mora has been irreparably injured.


## AS AND FOR THE SECOND CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF AGAINST ALL DEFENDANTS

### Violation of Constitutional Rights Under Color of State Law
### —Malicious Prosecution—

65. Plaintiff incorporates by reference and realleges each and every allegation stated in

Paragraphs 1 through 64.

66. The Fourth Amendment of the United States Constitution protects citizens from

overzealous and malicious prosecution by government officials without probable cause.

67. Arturo Mora was prosecuted, without probable cause, relative to the August 7, 2011

alleged attempted robbery as set forth herein.

68. Said charges resulted in a loss of liberty for Mr. Mora, as he was incarcerated for over a

month, and forced to fight the false charges for two years, culminating in a trial, as a

result of the aforedescribed false and improper charges; Mora also incurred substantial

financial and emotional damages as a direct result.

69. Mr. Mora's criminal proceeding was terminated in favor of Mr. Mora, as he was

unambiguously acquitted of all charges at trial.

70. Defendants' actions were motivated by bad faith, malice, and/or deliberate indifference to the rights of Arturo Mora.

71. This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

72. As a direct and proximate result of the unconstitutional acts described above, Plaintiff Arturo Mora has been irreparably injured.

### AS AND FOR THE THIRD CAUSE OF ACTION
### ON BEHALF OF THE PALINTIFF AGAINST ALL DEFENDANTS

**Violation of Constitutional Rights Under Color of State Law**

**-Denial of Constitutional Right to Fair Trial Due to Fabrication of Evidence-**

73. Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 72.

74. Defendants created false evidence against Plaintiff Arturo Mora, as set forth herein.

75. Defendants forwarded false evidence and false information to prosecutors in the Bronx County District Attorney's office in order to secure the Plaintiff's conviction.

76. Defendants misled the judge and the prosecutors by creating false evidence against Plaintiff Arturo Mora and thereafter providing false testimony throughout the criminal proceedings.

77. In creating false evidence against Plaintiff Arturo Mora, in forwarding false evidence and information to prosecutors, and in providing false and misleading testimony, Defendants violated Plaintiff's constitutional right to a fair trial under the Due Process Clause of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

78. This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

79. As a direct and proximate result of the unconstitutional acts described above, Plaintiff Arturo Mora has been irreparably injured.

## AS AND FOR THE FOURTH CAUSE OF ACTION
## ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS

### Violation of Constitutional Rights Under Color of State Law
### -Failure to Intercede-

80. Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 79.

81. The Fourth Amendment of the United States Constitution protects citizens from unreasonable searches and seizures by government officials, and prohibits law enforcement officers from arresting and detaining individuals in the absence of appropriate authorization.  The Fourth Amendment also precludes police officers from conducting arrests in the absence of probable cause to believe that a crime has been committed.

82. The actions of Defendant officers detailed herein violated Arturo Mora's rights under the United States Constitution.  It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.

83. Defendants' actions were motivated by bad faith and malice, and/or deliberate indifference to the rights of Arturo Mora.

84. This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

85. As a direct and proximate result of the unconstitutional acts described above, Plaintiff Arturo Mora has been irreparably injured.

## AS AND FOR THE FIFTH CAUSE OF ACTION
## ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS

### Violation of Constitutional Rights Under Color of State Law
### -Conspiracy to Violate Plaintiff's Civil Rights-

86. Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 85.

87. Defendant officers acting under color of state law in both their individual capacities and as agents for the City of New York, conspired together, reached a mutual understanding, and acted in concert to undertake a course of conduct violative of Plaintiffs' civil rights by:

    a. Agreeing to deliberately and maliciously fabricate evidence against the Plaintiff, and otherwise abuse process;

    b. Agreeing to contrive false charges and falsely arrest/maliciously prosecute the Plaintiff; and

    c. Agreeing not to intervene with any of the police misconduct directed at Mr. Mora;

88. This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

89. Defendants' actions were motivated by bad faith, malice, and/or deliberate indifference to the rights of Mr. Mora.

90. As a direct and proximate result of the unconstitutional acts described above, the Plaintiff Arturo Mora has been irreparably injured.

## AS AND FOR THE SIXTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF AGAINST
## ALL DEFENDANTS

### Violation of Constitutional Rights Under Color of State Law
### —Malicious Abuse of Process—

91. Plaintiff incorporates by reference and reallege each and every allegation stated in Paragraphs 1 through 90.

92. Defendants issued legal process against the Plaintiff.

93. Defendants issued legal process against the Plaintiff to obtain a collateral objective outside the legitimate ends of the legal process.

94. Defendants issued legal process to: generate a pretext to enter and search the residence located at 1686 Morris Avenue as set forth herein, and/or achieve professional accolades for making a highly touted "gun collar" arrest.

95. Defendants acted with intent and without excuse or justification.

96. This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

97. As a direct and proximate result of the unconstitutional acts described herein, Plaintiff has been irreparably injured.


## AS AND FOR THE SEVENTH CAUSE OF ACTION
## ON BEHALF OF THE PLAINTIFF AGAINST DEFENDANT CITY OF NEW YORK

### Violation of Constitutional Rights Under Color of State Law
### -Implementation of Municipal Policies, Practices, and Customs that Directly Violate
### Constitutional Rights, Failure to Implement Municipal Policies to Avoid Constitutional
### Deprivations and Failure to Train and Supervise Employees
### Under Color of State Law-

13

98. Plaintiff incorporates by reference and reallege each and every allegation stated in Paragraphs 1 through 97.

99. Upon information and belief, Defendants City of New York, Defendant Supervisors Sanchez and John Doe(s) were supervisors and final decision makers, as a matter of policy, practice, and custom, acted with a callous, reckless and deliberate indifference to the Plaintiff's constitutional rights and laws of the United States, in that they failed to adequately discipline, train, supervise or otherwise direct police officers concerning the rights of citizens, allowed or encouraged employees to fabricate evidence against the Plaintiff, allowed or encouraged failures to disclose exculpatory evidence, allowed or encouraged the forwarding of false or otherwise unreliable evidence to prosecutors in order to secure the Plaintiff's indictment and conviction, allowed or encouraged officers to testify falsely, allowed or encouraged officers to manipulate/encourage/coerce witnesses into fabricating evidence, and allowed or encouraged failures to  investigate further when evidence plainly indicated further investigation was warranted.

100. In the alternative, and upon information and belief, Defendants City of New York, Defendant Supervisors Sanchez and John Doe(s) instituted policies addressing the topics listed above, but through a culture of gross negligence, carelessness, and malice displayed by New York City police officers, demonstrated a deliberate and willful indifference to the constitutional rights of the Plaintiff.

101. It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the clearly established constitutional rights of citizens from infringement by other law enforcement officers in their presence.

102. At all times relevant herein, the right to be free from deprivations of liberty interests caused by unjustifiable criminal charges and procedures were clearly established constitutional rights that a reasonable person would have known.

103. Upon information and belief, over a span of years, the Defendants, both named and John Does, were named in police misconduct investigations; nevertheless, none were ever subject to appropriate disciplinary action.  In fact, upon information and belief, Defendants Heilig and Holshek were *promoted* following the Plaintiff's wrongful arrest, giving rise to an inference that the officers' tactics were not only condoned throughout the department, but rewarded.

104. In 2011, some two-dozen Bronx-based NYPD officers were subject to criminal charges[1] involving allegations of "fixing" tickets for friends and relatives.

105. Upon information and belief, in July of 2012, after discovering that many people arrested on charges of criminal trespass at Bronx County housing projects were innocent, even though police officers had provided written statements to the contrary, the Bronx district attorney's office quietly adopted a policy[2] of no longer prosecuting people who were stopped at public housing projects and arrested for trespassing, unless the arresting officer was interviewed to ensure that the arrest was warranted.

106. On February 2, 2012, officers from the 47th Precinct in the Bronx wrongfully entered the home of 18 year old Ramarley Graham and shot the unarmed youth to death in his

---

[1] See Big Inquiry Into Ticket-Fixing in New York, New York Times, April 17, 2011, available at http://www.nytimes.com/2011/04/18/nyregion/ticket-fixing-by-police-investigated-in-new-york.html?_r=0&adxnnl=1&adxnnlx=1400166713-OlwMCl6A6jnLyJC00DdeoQ
[2] Prosecutor Deals Blow to Stop and Frisk Tactic, New York Times, September 25, 2012, available at http://www.nytimes.com/2012/09/26/nyregion/in-the-bronx-resistance-to-prosecuting-stop-and-frisk-arrests.html?pagewanted=all

bathroom as he was allegedly trying to flush a small quantity of marijuana down the toilet.

107. On June 27, 2011, former Bronx-based N.Y.P.D police officer and later Sergeant William Eiseman pled guilty to one count of felony first-degree perjury and three counts of official misconduct stemming from allegations that he personally filed false instruments, intentionally testified falsely, and encouraged his subordinates to act in kind.

108. In or about July of 2013, the Kings County District Attorney's Office announced the formation of an unprecedented panel[3] of former prosecutors, professors, and retired judges to review as many as 50 convictions involving a former Kings County detective, Louis Scarella, who is alleged to have regularly sought false statements from witnesses, and whose work appears to have sent an array of innocent citizens to prison.

109. Long time Kings County District Attorney Charles Hynes was recently voted out of office amidst widespread[4] allegations of misconduct.

110. Upon information and belief, former Kings County Detective, Michael Race, whose work has also been linked to the conviction of innocents, has been quoted in press[5] accounts as stating that of the 750 murder investigations he ran, only one was "done the correct way, A to Z."

[3] Panel Named to Review Trial Convictions Involving Retired Brooklyn Detective, July 2, 2013, Brooklyn Daily Eagle, available at http://www.brooklyneagle.com/articles/panel-named-review-trial-convictions-involving-retired-brooklyn-detective-2013-07-02-180000

[4] See e.g., Charles Hynes, Scandal-Plagued District Attorney, Faces Verdict at the Polls, ProPublica, September 6, 2013, available at http://www.huffingtonpost.com/2013/09/06/charles-hynes-brooklyn-district-attorney-election_n_3881395.html; Brooklyn DA Charles Hynes in the Hot Seat for Protecting Prosecutor Who Imprisoned Innocent Man, New York Daily News, November 16, 2012, available at http://www.nydailynews.com/new-york/bklyn-da-charles-hynes-hot-seat-wrongful-conviction-article-1.1203342; Ex-Brooklyn Prosecutor Charles J. Hynes Accused of Misues of Funds, New York Times, available at http://www.nytimes.com/2014/06/03/nyregion/charles-hynes-brooklyn-district-attorney-inquiry.html.

[5] See e.g., In a 1992 Murder, Evidence of Flawed Justice, July 4, 2013, New York Times, available at http://www.nytimes.com/2013/07/05/nyregion/in-a-1992-murder-evidence-of-flawed-justice.html

111. In August of 2013, federal Judge Shira A. Sheindlin of the Southern District of New York found[6] that the New York City Police Department resorted to a "policy of indirect racial profiling" as officers routinely stopped "blacks and Hispanics who would not have been stopped if they were white." The Plaintiff in this case is African American, and has alleged being the target of racial epithets while being assaulted by Defendant Eiseman, who is Caucasian.

112. Mayor Bill De Blasio ran his winning campaign[7] in substantial part on the need for "much needed reforms," with the NYPD, calling for "new leadership," the appointment of an "inspector general," to oversee the NYPD, and the introduction of a "strong racial profiling bill."

113. The nature, regularity, and scale of such revelations, and the extraordinary efforts being undertaken in response to a highly publicized slew of wrongful convictions, gives rise to an inference of systemic incompetence and corruption on the part of the New York City Police Department, as such a widespread legacy of injustices cannot plausibly be laid at the feet of a few rogue officers.

114. Defendant(s) also, upon information and belief, demonstrated deliberate indifference to the rights of those arrested in the City of New York by failing to adequately hire, screen, train, and supervise officers in Bronx County and the 44th Precinct.

115. The policies, procedures, customs and practices of the above-referenced Defendants violated the Constitutional rights of the Plaintiff under the Fourth, and Fourteenth Amendments of the United States Constitution.

---

[6] Judge Rejects New York's Stop and Frisk Policy, August 12, 2013, New York Times, available at http://www.nytimes.com/2013/08/13/nyregion/stop-and-frisk-practice-violated-rights-judge-rules.html?pagewanted=all
[7] See Bill DeBlasio campaign website @ http://www.billdeblasio.com/issues/crime-fighting-public-safety

116. This conduct on the part of Defendants also represents a violation of 42 U.S.C § 1983, given that said actions were undertaken under color of state law.

117. Upon information and belief, none of the Defendants named herein were disciplined in for their actions relative to the Plaintiff; in fact, as stated, Defendants Heilig and Holshek were ultimately promoted.

118. As a direct and proximate result of the unconstitutional acts described above, the Plaintiff has been irreparably injured.

## DEMAND FOR PUNITIVE DAMAGES

119. The actions of Defendants described herein were extreme and outrageous, and shock the conscience of a reasonable person.  Consequently, an award of punitive damages is appropriate to punish the Defendants.  Plaintiff does not seek punitive damages against the City of New York.

## DEMAND FOR TRIAL BY JURY

120. The Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Arturo Mora requests that this Honorable Court grant him the following relief:

A. A judgment against Defendants Sanchez, Heilig, Holshek, Gibson, and John Doe #1-10 for compensatory damages, and punitive damages in an amount to be determined by a properly charged jury;

B. A judgment in favor of Plaintiff against Defendant City of New York for compensatory damages in an amount to be determined by a properly charged jury;

C. A monetary award for attorneys fees and costs of this action, pursuant to 42 U.S.C. § 1988;

D. Any other relief this Court finds to be just, proper, and equitable.

Dated:  New York, New York
        August 7, 2014

Respectfully Submitted By:
The Law Office of Andrew L. Hoffman, P.C.
By:

Andrew L. Hoffman, Esq.
SDNY Bar Code Number: AH2961
261 Madison Avenue, 12 Floor
New York, New York 10016
T:      (212) 736-3935
E: ahoffman@andrewhoffmanlaw.com

19